### IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case Nos. 23-00171-01-CR-W-DGK |
| | 24-00177-02-CR-W-DGK |
| ARTHUR L. REYNOLDS, III, | |
| a/k/a "Straight Edge," | |
| Defendant. | |

### PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

**1.  The Parties.**   The parties to this agreement are the United States Attorney's Office for the Western District of Missouri (otherwise referred to as "the Government" or "the United States"), represented by Jeffrey P. Ray, Acting United States Attorney, and Bradley K. Kavanaugh, Assistant United States Attorney, and the defendant, Arthur L. Reynolds, III, ("the defendant"), represented by David A. Kelly.

The defendant understands and agrees that this plea agreement is only between him and the United States Attorney for the Western District of Missouri, and that it does not bind any other federal, state, or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

1

2.  **Defendant's Guilty Plea.**   The defendant agrees to and hereby does plead guilty to Count One of the Indictment in Case Number 23-00171-01-CR-W-DGK, charging him with a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8), that is felon in possession of firearms, Count Three of the Indictment in Case Number 24-00177-02-CR-W-DGK, charging him with a violation of 18 U.S.C. §§ 1959(a)(3) and 2, that is assault with a dangerous weapon in aid of racketeering, and Count Four of the Indictment in Case Number 24-00177-02-CR-W-DGK, charging him with a violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2, that is discharge of a firearm during and in relation to a crime of violence.

Additionally, the defendant admits the allegations of forfeiture contained in the Indictment in Case Number 23-00171-01-CR-W-DGK, and agrees to forfeiture of a Smith and Wesson, model M&P Shield, .45 caliber semi-automatic handgun, serial number JCN2374, a Smith and Wesson, model M&P Shield, .40 caliber semi-automatic handgun, serial number JEM2135, a RIA, model VR60 12 gauge shotgun, serial number R162409, a Smith and Wesson, model M&P15, 5.56mm semi-automatic rifle, serial number TN98996, a Lorcin, model L380 .380 caliber semi-automatic handgun, serial number 533367, a SCCY, model CPX-1 9mm semi-automatic handgun, serial number 284480, and a Smith and Wesson, model 29-3 .44 Magnum revolver, serial number AYC1643, all as contained in the Indictment.

By entering into this plea agreement, the defendant admits that he knowingly committed these offenses, and is in fact guilty of these offenses.

3.  **Factual Basis for Guilty Plea.**   The parties agree that the facts constituting the offenses to which he is pleading guilty are as follows:

> The Pagan's Motorcycle Gang ("PMG") is a violent criminal organization whose members and associates engage in criminal activities such as drug trafficking, robbery, extortion, assault, and attempted murder in the Western District of Missouri and elsewhere.  The PMG is an organization that maintains

2

established membership chapters in numerous U.S. States and territories, including multiple active chapters in Missouri. The PMG and their associates have engaged in numerous types of violent crimes to obtain and maintain control over other motorcycle clubs and gangs all over the United States. The PMG are territorial and protect their territory from rival Outlaw Motorcycle Gangs ("OMG") through violence and intimidation. The primary rivals to the PMG in Missouri include the Hells Angels, Outlaws, El Forastero, Galloping Goose, Sons of Silence, and the Bandidos. To protect the power, reputation, and territory of the PMG enterprise, members and associates of the PMG are required to commit acts of violence, threats of violence, and acts of intimidation. These acts of violence include assault, often with deadly weapons including firearms and axe handles. PMG members and associates maintain and enhance their status in the PMG enterprise by participating in such violent acts. The PMG also work with and often incorporate "support clubs" to enforce territory and engage in violence against rival OMGs. Members of these support clubs usually use their position to earn full-patched membership into the PMG. In Missouri, the primary support club for the PMG was the Los-Valerosos ("LV").

On May 17, 2022, LV member Graham Gattis, a/k/a "Dro," sent a Signal message to the PMG Kansas City Chapter President Christopher W. McGowen, a/k/a "Mac," with a photo of two Bandidos OMG members, Victim #1 and Victim #2, sitting at a bar. Upon receipt of the photos, McGowen directed Gattis, "If they are there when you get there let them know that that is a Pagan bar now and they are not welcome lol". Two weeks later, on May 30, 2022, Victim #1 was assaulted by eight to twelve members of the PMG and LV at the Sonic Drive-In, in Grain Valley, Missouri. Among the eight to twelve were McGowen, PMG member Jeremiah Z. Hahn, a/k/a "Pass Out," and LV support club member John J. Hahn, a/k/a "Krazy Legs". Jeremiah Z. Hahn, who was armed with an axe handle, struck Victim #1 with the axe handle as others used their fist. Victim #1, who was alone at the time, received injuries prior to fleeing in his vehicle. McGowen was later awarded a "Taking Care of Business" (TCB) patch and Jeremiah Z. Hahn was awarded a "42" patch for this event.

On September 3, 2022, PMG member Charles E. Smith, Jr., a/k/a "Crash," was assaulted at the Rawhide Harley Davidson, in Olathe, Kansas, by members of the Sons of Silence ("SOS") OMG. Following the assault, PMG and LV members met at the residence of PMG member James W. Prettyman, a/k/a "Rugby" in Blue Springs, Missouri to plot a revenge attack. Members devised a plan to travel as a group to Topeka, Kansas to find a SOS member. The PMG members had learned that the SOS were having an event in Topeka, Kansas the same weekend that SOS members had attacked Smith. The plan was to use either an axe handle or a gun on one of the SOS members.

PMG and LV members, including: President of Presidents ("POP") for the Southwest PMG John T. Fisher, a/k/a "T-Bone", McGowen, Jeremiah Z. Hahn, PMG Branson/Joplin Chapter President Robert W. Miller, a/k/a "Flipper," PMG

member **Arthur L. Reynolds, a/k/a "Straight Edge,"** Smith, Prettyman, LV Warrensburg Chapter President Monty D. Mitchell, a/k/a "Smoke," and LV member Alan M. Thornton, a/k/a "Bones", loaded into multiple vehicles and traveled from Blue Springs, Missouri to Topeka, Kansas to begin searching for a SOS victim. As "POP," Fisher made the decision who went to Topeka, Kansas and they were to "smash on sight" anyone they saw. Fisher wanted to "catch a stray" (SOS member). Once in Topeka, Kansas, Fisher handed Jeremiah Z. Hahn a gun and "they discussed that they should shoot a SOS member." The PMG Topeka assault team then located a SOS member in the Wyndham Topeka Downtown Hotel parking lot. Upon locating their target, Jeremiah Z. Hahn said, "As soon as I fire, I need you to get the fuck out of here." As Jeremiah Z. Hahn rolled down the car window to shoot, **Reynolds** objected, stating "he didn't want to do this," that he believed the goal of retaliation was assault of a SOS member, not murder. The decision was then made to return to Missouri without attacking the SOS member. Jeremiah Z. Hahn, who was the PMG's Missouri State Sgt. at Arms, told **Reynolds** that if it happened again, he would take his "cut" (PMG's OMG jacket, putting **Reynolds** out of the club). Jeremiah Z. Hahn was later awarded a "Regulator" patch for the SOS incident in Topeka, Kansas.

On the afternoon of September 17, 2022, Prettyman sent the following Signal message to other PMG and LV members: "To night [sic] we are showing out in force in blue springs [sic] meet at qt on 7 and 70 at 7 for those that are working do not respond everyone else needs to reply." The following PMG and LV responded that they copied the call to action: PMG prospect Jeffrey S. Hannah, a/k/a "Got-It," PMG prospect Mark A. Cottman, a/k/a "One Shot," Jeremiah Z. Hahn, Mitchell, John J. Hahn, and **Reynolds**.

That evening, at approximately 8:51 p.m., officers with the Blue Springs, Missouri, Police Department ("BSPD") were dispatched to US 40 Highway and SE Adams Dairy Parkway, Blue Springs, Missouri, in response to a shooting. Upon arrival, BSPD officers located several motorcycles and individuals suffering from gunshot wounds on the side of US 40 Highway. The BSPD officers immediately recognized many of the individuals suffering from gunshot wounds were wearing vests emblazoned with OMG patches, including PMG, LV, and one vest with Bandidos' insignia. As BSPD officers arrived on scene, PMG members Prettyman and Smith were attempting to collect clothing and an axe handle from the crime scene.

Following the shooting, four victims were transported to area hospitals with gunshot wounds. A fifth individual, Gattis, walked into St. Mary's hospital with gunshot wounds to both legs. Gattis was driven to the hospital in a white pickup truck by LV associates Bryan S. Fletcher, a/k/a "Fletch" and Eric M. Forsyth, Jr., a/k/a "EZ." The five individuals shot were: Mitchell, John J. Hahn, Cottman, Gattis, and a Bandidos motorcycle gang member. Cottman had a gunshot wound to the thigh, John J. Hahn had wounds to his calf and thigh, and Mitchell had a wound to his back. The Bandidos member had been shot seven times, with

4

wounds to his knee, thigh, forearm, biceps, buttocks and back of his leg.

Investigators later learned that in addition to Gattis, Fletcher, and Forsyth, the following had fled the scene of the shooting prior to the arrival of law enforcement: McGowen, Miller, PMG prospect Brandon S. Hodge, a/k/a "Youngblood," **Reynolds**, and Hannah.

The investigation revealed the shooting occurred after numerous PMG and LV members chased down and forced the lone Bandidos member to stop on the side of US 40 Highway in Blue Springs. At the scene, investigators observed six motorcycles on the shoulder of US 40 Highway. Throughout the crime scene, officers observed multiple 9mm and .45 caliber shell casings, a loaded .45 caliber magazine, a Colt .45 caliber pistol, an axe handle, and a set of LV colors. Investigators observed one of the motorcycles, a maroon and silver Harley Davidson, had a full-face helmet on the seat with stickers showing membership in the PMG. This helmet, which belonged to Prettyman, also contained a sticker of the Bandidos' "Fat Mexican" insignia, with a fiery sword, called "Twilight," running through the head and out of the face of the "Fat Mexican." Investigators obtained search warrants for the six motorcycles and upon execution, seized additional firearms, ammunition, bloody clothing, and PMG and LV vests.

Based on Prettyman's September 17th Signal message directing members to meet at QuikTrip at the intersection of Highway 7 and I-70 prior to the shooting, law enforcement obtained the QuikTrip surveillance video. The video captured some of the PMG members who were present in Blue Springs prior to the shooting, including PMG members and prospects Smith, McGowen, **Reynolds**, Miller, Hodge, and Cottman. At least two other PMG members were observed in the video but not identified due to their distance from the camera. Additionally, several members and prospects of the LV were observed meeting the PMG members. The investigative team was able to identify some of those subjects as Gattis, Fletcher, and Forsyth.

On November 22, 2022, the Bandidos victim ("Victim #2") agreed to an interview with investigators. Victim #2 identified himself as the Sergeant at Arms for the Kansas City, Missouri, chapter of the Bandidos. Asked about the circumstances leading up to the shooting, Victim #2 said just prior to the shooting, he had been heading home from the funeral of a fellow Bandidos member in Oklahoma. As Victim #2 exited off I-70 East onto 40 Highway, he noticed there was a vehicle pacing him. Victim #2 continued riding south on 40 Highway. When Victim #2 arrived at the light at the intersection of 40 and 7 Highways, he observed a motorcycle driver and passenger on a motorcycle parked at the intersection. At about this same time, Victim #2 heard other motorcycles coming up from behind him. As he rolled through the light at the intersection of 40 and 7 Highways, the other motorcycles who had pulled up behind him began trying to force him over on the side of 40 Highway. Victim #2 feared what would happen if the other motorcycles were able to force him off the road, so he attempted to

5

speed away. The other motorcycles pursued him. At this time, Victim #2 observed a white pickup truck traveling with the motorcycles that were pursuing him.

As Victim #2 approached the intersection of 40 Highway and SE Adams Dairy Parkway, he realized the motorcycles and truck were "on him" and he was not going to be able to get away. Victim #2 thus locked the brakes on his motorcycle and slid off onto the shoulder of the road. Victim #2 believed that had he not stopped on his own, he would have been forced off the road. Victim #2 said he left his helmet on, as he was aware of the assault of another Bandido member, Victim #1, that occurred on May 30, 2022, at the Grain Valley Sonic Drive-In, by PMG members.

Victim #2 parked his motorcycle facing east. The PMG and LV members on the other motorcycles turned around and were facing west towards him. As the PMG and LV members dismounted their motorcycles and ran up to him, Victim #2 flipped up his visor and said "We ain't gotta do this. You stay in your lane, I'll stay in my lane." Victim #2, who knew McGowen previously, said that McGowen replied "Yes, we do" and then someone shot Victim #2 twice. After being shot twice, Victim #2 – still standing – returned fire. During the exchange of fire, Victim #2 was struck in the arm, causing him to drop his gun. As he turned to get away, Victim #2 recalled being shot two more times.

Victim #2 explained, while it was difficult to see because he was looking into the headlights of the PMG and LV members' motorcycles, he did see that one of his attackers was carrying a "pick handle." Asked why the PMGs and LVs had decided to attack him, Victim #2 said he was unsure of the motive but advised he had heard the PMG had offered a $5,000 bounty on the Bandidos "patch."

On and between October 7, 2022, through October 9, 2022, numerous PMG members involved in the Bandidos shooting attended a PMG State party in Sulphur Springs, Texas. "Mother Club" PMG members, a/k/a "13s", were in attendance. At the meeting, **Reynolds**, McGowen, Hannah, and Cottman were awarded "Taking Care of Business" ("TCB") patches for their role in the Bandidos shooting incident. Smith received two "TCB" patches – one for his actions during the Rawhide Harley Davidson assault on September 3, 2022, and a second for his role in the Bandidos shooting. Cottman also received his PMG patch, becoming a PMG member. Later, while at PMG Nationals in Pennsylvania, Miller and Hodge were awarded TCB patches for their involvement in the shooting.

On May 8, 2023, a search warrant was obtained from the United States District Court in the Western District of Missouri for **Reynolds's** residence, located at 4905 Downey Avenue, Independence, Missouri. On May 11, 2023, members of the Independence, Missouri Police Department executed the warrant. Inside the residence, officers located a Smith and Wesson, model M&P Shield, .45 caliber semi-automatic handgun, serial number JCN2374, a Smith and Wesson, model

6

M&P Shield, .40 caliber semi-automatic handgun, serial number JEM2135, a RIA, model VR60 12 gauge shotgun, serial number R162409, a Smith and Wesson, model M&P15, 5.56mm semi-automatic rifle, serial number TN98996, a Lorcin, model L380 .380 caliber semi-automatic handgun, serial number 533367, a SCCY, model CPX-1 9mm semi-automatic handgun, serial number 284480, and a Smith and Wesson, model 29-3 .44 Magnum revolver, serial number AYC1643, multiple firearm magazines, various calibers of ammunition, body armor, and Pagan's Motorcycle Gang related-items, including support shirts, patches, and paperwork for the Pagan's.   A black 2022 Harley Davidson with Missouri personalized plate "SOBR" was parked in the garage.   In the right saddlebag was a magazine holster containing a .45 caliber magazine containing seven (7) rounds of Smith and Wesson .45 caliber ammunition.   In the same saddlebag was an inspection slip for the motorcycle with **Reynolds's** name on it and a Rawhide Harley Davidson VIP passport with **Reynolds's** name on it.   The title application for the motorcycle was in the left saddlebag.   In the dining room area, a blue backpack was located on a chair.   From the big pouch area of the backpack was a black t-shirt that had "Hells Angels, "Outlaws", "Bandidos" printed upside down with text underneath that said, "We Are Above All".   In the front pouch of the backpack was an envelope that had "State Party" printed on it.   The envelope contained receipts for beer, liquor, and soft drinks.   In the front lower pouch of the backpack was a Smith and Wesson M&P .40 caliber magazine containing six (6) rounds of WMA ammunition.

A criminal history check of **Reynolds** revealed the following:

- On January 24, 2005, **Reynolds** pled guilty to felony aggravated robbery in the District Court of Johnson County, Kansas, case number 04-CR-2516, and was sentenced on March 10, 2005, to 61 months in custody.

Special Agent Stephen White with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) was contacted concerning the firearms.   SA White provided verbal confirmation that the SCCY, model CPX-1 9mm semi-automatic handgun, the Smith and Wesson, model M&P15, 5.56mm semi-automatic rifle, the Lorcin, model L380 .380 caliber semi-automatic handgun, the RIA, model VR60 12 gauge shotgun, the Smith and Wesson, model M&P Shield, .45 caliber semi-automatic handgun, the Smith and Wesson, model M&P Shield, .40 caliber semi-automatic handgun, and the Smith and Wesson, model 29-3 .44 Magnum revolver were not manufactured in the State of Missouri, and therefore, all had travelled in interstate commerce prior to recovery in Missouri.

**4. Use of Factual Admissions and Relevant Conduct.** The defendant acknowledges, understands and agrees that the admissions contained in Paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). The defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the Indictment as well as all other uncharged related criminal activity may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charge to which he is pleading guilty.

**5. Statutory Penalties.** The defendant understands that upon his plea of guilty to Count One of the Indictment in Case Number 23-00171-01-CR-W-DGK, charging him with a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8), that is felon in possession of firearms, the maximum penalty the Court may impose is not more than fifteen (15) years' imprisonment, a $250,000 fine, and three (3) years of supervised release. The defendant further understands that this offense is a Class C felony.

The defendant understands that upon his plea of guilty to Count Three of the Indictment in Case Number 24-00177-02-CR-W-DGK, charging him with a violation of 18 U.S.C. §§ 1959(a)(3) and 2, that is assault with a dangerous weapon in aid of racketeering, the maximum penalty the Court may impose is not more than twenty (20) years' imprisonment, a $250,000 fine, and three (3) years of supervised release. The defendant further understands that this offense is a Class C felony.

The defendant understands that upon his plea of guilty to Count Four of the Indictment in Case Number 24-00177-02-CR-W-DGK, charging him with a violation of 18 U.S.C.

8

§§ 924(c)(1)(A)(iii) and 2, that is discharge of a firearm during and in relation to a crime of violence, the minimum penalty the Court may impose is ten (10) years imprisonment, while the maximum penalty the Court may impose is life imprisonment and not more than a $250,000 fine. In addition, the Court shall impose not more than five (5) years of supervised release. Further, notwithstanding any other provision of law, the Court shall not place on probation any person convicted of this offense and any term of imprisonment for this count shall be in addition to, and run consecutive to, any other term of imprisonment imposed. The defendant further understands that this offense is a Class A felony.

Additionally, the defendant understands that based on his admission to the criminal forfeiture allegation in Case Number 23-00171-01-CR-W-RK, the Court will enter an order of forfeiture for the Smith and Wesson, model M&P Shield, .45 caliber semi-automatic handgun, serial number JCN2374, the Smith and Wesson, model M&P Shield, .40 caliber semi-automatic handgun, serial number JEM2135, the RIA, model VR60 12 gauge shotgun, serial number R162409, the Smith and Wesson, model M&P15, 5.56mm semi-automatic rifle, serial number TN98996, the Lorcin, model L380 .380 caliber semi-automatic handgun, serial number 533367, the SCCY, model CPX-1 9mm semi-automatic handgun, serial number 284480, and the Smith and Wesson, model 29-3 .44 Magnum revolver, serial number AYC1643, all as alleged in the Indictment.

Lastly, the defendant understands that the Court shall impose a $100 mandatory special assessment *per felony count of conviction*, which must be paid in full at the time of sentencing.

**6. Sentencing Procedures.** The defendant acknowledges, understands and agrees to the following:

    a. In determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States

9

Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable";

b.     The Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing;

c.     As to Count One of the Indictment in Case Number 23-00171-01-CR-W-DGK, in addition to a sentence of imprisonment, the Court may impose a term of supervised release of up to three (3) years; that the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed;

d.     As to Count Three of the Indictment in Case Number 24-00177-02-CR-W-DGK, in addition to a sentence of imprisonment, the Court may impose a term of supervised release of up to three (3) years; that the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed;

e.     As to Count Four of the Indictment in Case Number 24-00177-02-CR-W-DGK, in addition to a sentence of imprisonment, the Court may impose a term of supervised release of up to five (5) years; that the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed;

f.     If the defendant violates a condition of supervised release, the Court may revoke that supervised release and impose an additional period of imprisonment without credit for time previously spent on supervised release.   In addition to a new term of imprisonment, the Court also may impose a new period of supervised release;

g.     The Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range;

h.     Any sentence of imprisonment imposed by the Court will not allow for parole;

i.     The Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office; and

j.     The defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court.

10

k. The defendant agrees that the United States may institute civil, judicial or administrative forfeiture proceedings against all forfeitable assets in which the defendant has an interest, and that the defendant will not contest any such forfeiture proceedings;

l. The defendant agrees to forfeit all interests the defendant owns or over which the defendant exercises control, directly or indirectly, in any asset that is subject to forfeiture to the United States either directly or as a substitute for property that was subject to forfeiture but is no longer available for the reasons set forth in 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c), including but not limited to the following specific property: *a Smith and Wesson, model M&P Shield, .45 caliber semi-automatic handgun, serial number JCN2374, a Smith and Wesson, model M&P Shield, .40 caliber semi-automatic handgun, serial number JEM2135, a RIA, model VR60 12 gauge shotgun, serial number R162409, a Smith and Wesson, model M&P15, 5.56mm semi-automatic rifle, serial number TN98996, a Lorcin, model L380 .380 caliber semi-automatic handgun, serial number 533367, a SCCY, model CPX-1 9mm semi-automatic handgun, serial number 284480, and a Smith and Wesson, model 29-3 .44 Magnum revolver, serial number AYC1643.* With respect to any asset which the defendant has agreed to forfeit, the defendant waives any constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment under the Eighth Amendment to the United States Constitution. Furthermore, the defendant consents to the destruction or any other disposition of the assets by the federal, state or local agency without further notice or obligation whatsoever owing to the defendant; and

m. The defendant agrees to take all necessary steps to comply with the forfeiture matters set forth herein before sentencing.

7. **Government's Agreements.** Based upon evidence in its possession at this time, the United States Attorney's Office for the Western District of Missouri, as part of this plea agreement, agrees not to bring any additional charges against the defendant for any federal criminal offenses related to being a felon in possession of firearms, assault with a dangerous weapon in aid of racketeering, and discharge of a firearm during and in relation to a crime of violence, for which it has venue and is related to the events which arose out of the defendant's conduct described in Paragraph 3 above.

11

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States Attorney for the Western District of Missouri has no knowledge.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further understands and agrees that if the Government elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

**8. Preparation of Presentence Report.** The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character, and conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the count to which he has pleaded guilty. The United States may respond to comments made or positions taken by the defendant or the defendant's counsel and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The United States and

12

the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

**9.** **Withdrawal of Plea.**    Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court.    In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible.    However, after the plea has been formally accepted by the Court, the defendant may withdraw his plea of guilty only if the Court rejects the plea agreement or if the defendant can show a fair and just reason for requesting the withdrawal.    The defendant understands that if the Court accepts his plea of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his plea of guilty.

**10.** **Agreed Guidelines Applications.**    With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

      a.      The Sentencing Guidelines do not bind the Court and are advisory in nature.    The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable";

      b.      The applicable Guidelines section for the offense of felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8), as charged in Count One of the Indictment in Case Number 23-00171-01-CR-W-DGK, is U.S.S.G. § 2K2.1(a)(4)(B)(i)(I) and (ii)(I), which provides for a base offense level of 20;

      c.      The parties agree that a +2 level enhancement is applicable, pursuant to U.S.S.G. § 2K2.1(b)(1)(A), because the offense involved 7 firearms;

      d.      The applicable Guidelines section for the offense of assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(3) and 2, as charged in Count Three of the Indictment in Case Number 24-00177-02-

13

CR-W-DGK, is U.S.S.G. § 2A2.2(a) and § 2E1.3(a)(2), which provides for a base offense level of 14;

      e.     The parties agree that a +5 level enhancement is applicable, pursuant to U.S.S.G. § 2A2.2(b)(2)(A), because a firearm was discharged;

      f.     The parties agree that a +7 level enhancement is applicable, pursuant to U.S.S.G. § 2A2.2(b)(3)(C), because the victim sustained permanent or life-threatening bodily injury;

      g.     The parties agree that the offense of discharge of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2, as charged in Count Four of the Indictment in Case Number 24-00177-02-CR-W-DGK, is governed by the provisions of U.S.S.G. § 2K2.4(b) and the guideline sentence for this offense is the minimum term of imprisonment required by statute, which shall be imposed to run consecutively to any other sentence of imprisonment. Furthermore, pursuant to U.S.S.G. § 3D1.1(b)(1) and 5G1.2(a), this offense is not grouped with other offenses of conviction;

      h.     The defendant has admitted his guilt and clearly accepted responsibility for his actions, and has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently. Therefore, he is entitled to a three-level reduction pursuant to § 3E1.1(a) and (b) of the Sentencing Guidelines. The Government, at the time of sentencing, will file a written motion with the Court to that effect, unless the defendant (1) fails to abide by all of the terms and conditions of this plea agreement and his pretrial release; or (2) attempts to withdraw his guilty plea, violates the law, or otherwise engages in conduct inconsistent with his acceptance of responsibility;

      i.     The parties agree that the Court will determine his applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office;

      j.     The defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does not bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels. Additionally, the failure of the Court to accept these stipulations will not, as outlined in Paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw his plea of guilty;

      k.     The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other

14

enhancement or adjustment), and any legally authorized increase above the normal statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the Indictment. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay; and

l.      The defendant understands and agrees that the factual admissions contained in Paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, support the imposition of the agreed-upon Guidelines calculations contained in this agreement.

**11.    Effect of Non-Agreement on Guidelines Applications.**   The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in Paragraph 10, and its subsections.   As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

**12.    Change in Guidelines Prior to Sentencing.**   The defendant agrees that if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option.   If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

**13.    Government's Reservation of Rights.**   The defendant understands that the United States expressly reserves the right in this case to:

a.      Oppose or take issue with any position advanced by defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

b.      Comment on the evidence supporting the charge in the Indictment;

c.      Oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed and that the United States

15

remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

      d.     Oppose any post-conviction motions for reduction of sentence, or other relief.

**14.**   **<u>Waiver of Constitutional Rights</u>.**    The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

      a.     The right to plead not guilty and to persist in a plea of not guilty;

      b.     The right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

      c.     The right to a jury trial, and at that trial, the right to the effective assistance of counsel;

      d.     The right to confront and cross-examine the witnesses who testify against him;

      e.     The right to compel or subpoena witnesses to appear on his behalf; and

      f.     The right to remain silent at trial, in which case his silence may not be used against him.

The defendant understands that by pleading guilty, he waives or gives up those rights and that there will be no trial. The defendant further understands that if he pleads guilty, the Court may ask him questions about the offense or offenses to which he pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement. The defendant also understands he has pleaded guilty to a felony offense and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

16

15. **Waiver of Appellate and Post-Conviction Rights.**

    a.      The defendant acknowledges, understands and agrees that by pleading guilty pursuant to this plea agreement he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct.

    b.      The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) an illegal sentence. An "illegal sentence" includes a sentence imposed in excess of the statutory maximum, but does *not* include less serious sentencing errors, such as a misapplication of the Sentencing Guidelines, an abuse of discretion, or the imposition of an unreasonable sentence. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

16. **Financial Obligations.**      By entering into this plea agreement, the defendant represents that he understands and agrees to the following financial obligations:

    a.      The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine.

    b.      The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control directly or indirectly, including assets and property held by a spouse, nominee or other third party. The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full.

    c.      Within 10 days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that compliance with these requests will be taken into account when the United States makes a recommendation to the Court regarding the defendant's acceptance of responsibility.

    d.      At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning

17

the identification and recovery of substitute assets and restitution.

e. The defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence.

f. The defendant understands that a Special Assessment will be imposed as part of the sentence in this case. The defendant promises to pay the Special Assessment of $300 by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing.

g. The defendant certifies that he has made no transfer of assets or property for the purpose of (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; nor (3) hindering efforts of the USAO to enforce such financial obligations. Moreover, the defendant promises that he will make no such transfers in the future.

h. In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution, and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

**17. Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive, or to authorize any third party to request or receive, from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

18

18. **Waiver of Claim for Attorney's Fees.**   The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

19. **Defendant's Breach of Plea Agreement.**   If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete, or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement.   The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his plea of guilty.

The defendant also understands and agrees that in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against him in any and all criminal proceedings.   The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

20. **Defendant's Representations.**   The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel.   The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement.   The defendant further acknowledges that no threats or promises, other than

19

the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys or any other party to induce him to enter his plea of guilty.

21. **No Undisclosed Terms.**    The United States and defendant acknowledge and agree that the above-stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

22. **Standard of Interpretation.**    The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings.    The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

Jeffrey P. Ray
Acting United States Attorney

Dated: 5/15/2025

Bradley K. Kavanaugh
Assistant United States Attorney
Violent Crime and Drug Trafficking Unit

20

I have consulted with my attorney and fully understand all of my rights with respect to the offenses charged in the Indictment in Case Number 23-00171-01-CR-W-DGK, and the Indictment in Case Number 24-00177-02-CR-W-DGK. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this plea agreement and I voluntarily agree to it.


Dated: _5/15/25_                    _____

                                    Arthur L. Reynolds, III
                                    Defendant


I am defendant Arthur L. Reynolds, III's attorney. I have fully explained to him, his rights with respect to the offenses charged in the Indictment in Case Number 23-00171-01-CR-W-DGK, and the Indictment in Case Number 24-00177-02-CR-W-DGK. Further, I have reviewed with him the provisions of the Sentencing Guidelines, which might apply in this case. I have carefully reviewed every part of this plea agreement with him. To my knowledge, Arthur L. Reynolds, III's decision to enter into this plea agreement is an informed and voluntary one.


Dated: _5/15/25_                    _____

                                    David A. Kelly
                                    Attorney for Defendant Arthur L. Reynolds,
                                    III


21